Filed 1/22/14  In re Abigail J. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ABIGAIL J. et al., Persons Coming Under the Juvenile Court Law. | |
| | D064458 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ14825A-D) |
| v. | |
| R.C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.

Michele Anne Cella, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

R.C. appeals the dispositional order removing custody of her four minor children under Welfare and Institutions Code section 361, subdivision (c)(1).[1] The trial court ordered removal of the children after R.C. allowed her husband, M.R., to return home while a restraining order against M.R. was in place and M.R. remained untreated for his domestic violence against R.C. and her two children and his sexual abuse of R.C.'s daughter. R.C. contends insufficient evidence supports the trial court's order. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

R.C. is the mother of the four children who are the subject of this appeal. In 1994, R.C. married Miguel J. and had two children by him: daughter Abigail J. (now 15) and son Alexis J. (now 13). R.C. divorced Miguel in 2003 and his whereabouts are currently unknown. R.C. met M.R. in 2003 and married him in 2004. They had two children together during their marriage: daughter S.R. (now eight) and son Benjamin R. (now seven).

M.R. became violent and controlling with R.C. He began beating R.C. when she became pregnant with S.R. in 2004. He would grab R.C. by her hair and drag her, punch her, slap her, grab her, and push her. M.R. was arrested in 2006 after he beat R.C. so severely that the entire right side of her face was bruised. When he was released from jail, M.R. raped R.C. M.R. continued forcing himself on R.C. about twice each week.

M.R. also physically and emotionally abused his stepchildren, Abigail and Alexis. He hit them with his hands, boots, a stick, a seat belt, and other household objects. He did not hit his own children, S.R. or Benjamin.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

M.R. began raping and molesting Abigail when she was seven years old.  When M.R. was mad at Abigail and wanted to punish her, he would rape or hit her.  Abigail estimates M.R. raped her at least once a month.  M.R. continued raping Abigail until she was in the sixth grade.  M.R. threatened to hurt Abigail's family if she told anyone about the sexual abuse.

The rapes usually occurred in M.R.'s bedroom.  When Alexis once asked Abigail what she was doing in the room, she told him it was too "complicated" and it was inappropriate to talk about with him.  Alexis later told a social worker that when he was seven Abigail told him that M.R. "tried to rape" her.  Alexis said he "did not know or suspect it had happened prior to his sister telling him."

When Abigail was in the fifth grade, she told her friend R.S. that M.R. tried to rape her and would hit her.  Later, R.S., who lived in the same apartment complex as Abigail, was looking in the window of Abigail's apartment and saw M.R. touching Abigail's breasts with his hands.  R.S. also saw M.R. hit Abigail with a belt and scream at her.

On May 13, 2010, M.R. beat R.C., bruising her arm and bruising and gashing her knee. The bruising lasted two weeks.  On May 21, M.R. attempted to rape Abigail again, but she was able to stop him.  Three days later, Abigail told R.C. that M.R. beats her and Alexis when R.C. is not home.  This prompted R.C. to obtain a restraining order against M.R.  The restraining order issued on June 23, 2010, and was in effect until June 23, 2013.  It prohibited M.R. from contacting or harassing R.C. and her four children.  M.R. fled to Mexico.  After M.R. left, Alexis told R.C. that M.R. had raped Abigail.

While R.C.'s restraining order application was pending, child protective services made an emergency response referral to the San Diego County Sheriff's Department.  Sheriff's

3

detectives investigated Abigail's sexual abuse claims by interviewing Abigail, Alexis, R.C., R.S., and others. During a July 22, 2010, interview, R.C. told a detective via a Spanish-language translator that "Abigail disclosed [M.R.] raped her more than once beginning when she was seven years old. He also touched her over her clothing. R.C. confronted [M.R.] with the allegations and he denied raping her." A sexual assault examination performed on Abigail in July 2010 could neither confirm nor deny sexual abuse. The other three children denied any sexual abuse by M.R.

R.C. gave a statement in Spanish to another detective in October 2010. R.C. stated she "found out about the abuse while Abigail was having a physical examination on [June 10, 2010].[2] She was in the examination room when Abigail told the doctor she had been molested. R.C. denied Alexis told her about it."

In early 2012, R.C. allowed M.R. to have contact with S.R. and Benjamin. M.R. was repentant and insisted he had changed. S.R. and Benjamin missed M.R., and R.C. was depressed and lonely without him. R.C. also needed M.R.'s help because she had "too much responsibility"—Benjamin had been diagnosed with autism, and R.C. had been diagnosed with cervical cancer. Abigail did not initially participate in the visits, but by mid-summer 2012 felt comfortable enough to do so, but "still didn't trust him."

M.R. began staying with the family in about April 2013. R.C. asked Abigail how she felt about this. Abigail explained that "she considered her siblings' feelings and agreed, however she outlined rules that [M.R.] would need to abide by. These rules included that he

---

2     It is unclear from the record whether R.C. intended to refer to the July 2010 sexual assault examination referenced above or to a separate physical examination conducted on June 10, 2010.

would never do anything to her again, nor do anything to hurt anyone in her family." Abigail denied "that [M.R.] engaged in any touching after he returned to the home," but added "that he made her cry, for example by teasing her after her pet frog and chick died."

In June 2013, the San Diego County Health and Human Services Agency (Agency) filed four juvenile dependency petitions—one for each child. The petitions alleged sexual abuse or sexual abuse of a sibling, physical abuse, and domestic violence between M.R. and R.C. The Agency recommended the children be detained out of the home because M.R. remained untreated for sexual abuse and domestic violence and R.C. allowed him back into the home, "which place[d] the child[ren] at substantial risk of serious physical harm." R.C. insisted she did not realize the extent of the abuse when she allowed M.R. to return. She said that to prevent further abuse, she would never leave the children alone with M.R.

At the detention hearing, the court found the Agency had made a prima facie showing on the petitions and ordered the children detained out of the home. The court allowed R.C. to have short, unsupervised visits on the condition that she not allow any contact between the children and M.R. Abigail and S.R. were placed in a confidential foster home, Alexis was detained at Polinsky Children's Center, and Benjamin was placed in a regional center due to his special needs.

In connection with the jurisdiction and disposition hearing, an Agency social worker submitted a jurisdiction/disposition report and, later, an addendum report. The jurisdiction report documented the social worker's interview of R.C. R.C. indicated she did not know all

the details of M.R.'s molestation of Abigail, nor did she want to know them.[3] When the social worker nevertheless conveyed to R.C. the contents of the petition regarding the molestation, R.C. "appeared flat and did not seem to react[,] seeming slightly annoyed." When the social worker pointed out that R.C. had allowed M.R. to have contact with the children knowing that he had not obtained any treatment for his domestic violence, R.C. responded "that was not her fault that he didn't get treatment."

The social worker's addendum report advised that R.C. had begun receiving counseling services. She had attended three sessions of a sexual abuse group for nonprotecting parents, but missed one due to having to attend an Individualized Education Program meeting for Benjamin. The group facilitator reported that R.C. "has a lot of learning to do" and is "upset with the system." R.C. had also attended four sessions of a domestic violence treatment group. The facilitator of that group characterized R.C. as "presenting herself as a victim" and as denying "knowing the reason her children are in custody." R.C. had attended one session of individual therapy.

The addendum report conveyed that R.C. visited her four children almost daily. As a result of her travel expenses for those visits, R.C. was unable to afford the rent on her two-bedroom apartment and was paying rent to sleep in someone's living room.

The social worker's addendum report concluded that R.C. "continues to be in denial regarding the risk [M.R.'s return to the home] presented to the children and to understand th[e] dynamics of sexual abuse in order to be protective of the children." The social worker

---

3    The Agency's detention report similarly recounted that R.C. told a San Diego County Sheriff's detective that "she knew very little" about "the extent of the sexual abuse to Abigail," and further stated "she didn't want to know all the details."

concluded that because "[i]t would appear that one of [R.C.'s] motivations for allowing contact with [M.R.] was for financial reasons," R.C.'s "limited income . . . contribute[s] to the likeliness that she will . . . put her children at further risk."

At the jurisdiction and disposition hearing, the court received the Agency's reports in evidence and heard testimony from the social worker, R.C., and Abigail. The social worker testified that although R.C. had begun counseling services, she had not yet reached the level of insight where she could protect the children. The social worker also testified she was concerned that R.C. was financially dependent on M.R., as evidenced by R.C.'s inability to keep up on rent payments for her apartment.

The social worker conceded that R.C. stated she would have nothing further to do with M.R., but the social worker had "concerns" because she saw a report that a male voice was overheard from R.C.'s end of a phone call, and during a visit, R.C. was seen talking to a man in a car who drove away right after the children were at the visit. The social worker could not confirm whether the man on the phone or in the car was M.R.

Finally, the social worker testified that she had just learned from the adult daughter of Abigail's foster mother that Abigail disclosed to the daughter that M.R. had sexually abused Abigail since returning home in 2013.

R.C. testified that she had begun counseling services and had also checked out library books on sexual abuse. She wanted her children returned to her, but admitted she would need a couple of weeks to find suitable living arrangements. R.C. insisted that if her children were returned to her, she would not allow M.R. to have any contact with them.

Abigail testified that she wanted to return home to her mother. She clarified that she had told her foster mother's daughter that the abuse by M.R. occurred in the past, not after his return in 2013. Abigail was not happy in foster care because the caregivers would not allow her to listen to Christian music in their home.

After considering the evidence presented and hearing argument of counsel, the court declared the children dependents, removed custody from R.C. under section 361, subdivision (c)(1), and ordered services be provided. No family caregivers were available, therefore the court ordered the Agency to find suitable licensed foster care. R.C. timely appealed.

DISCUSSION

R.C. challenges the sufficiency of the evidence supporting the trial court's decision to remove the children from her custody. She contends less drastic alternatives were available. We disagree.

A.    *Summary of Applicable Legal Principles and Standard of Review*

"Before the court may order a child physically removed from his or her parent's custody, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135; § 361, subd. (c)(1).) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136.) "In this regard, the court may consider the parent's past conduct as well as present circumstances." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917; *In re T.V.*, at p. 133 ["A parent's past conduct is a good predictor of future behavior."].) "Before

8

the court removes a child from parental custody, it must find there are no reasonable means by which the child's physical health can be protected without removal." (*In re Cole C.*, at p. 918; § 361, subd. (c)(1).) "Although the court must consider alternatives to removal, it has broad discretion in making a dispositional order." (*In re Cole C.*, at p. 918.)

We review the court's dispositional findings for substantial evidence.[4] (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 136.) "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) "We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary finding." (*In re T.V.*, at p. 133.) The court's jurisdictional findings are prima facie evidence the minor cannot safely remain in the home. (§ 361, subd. (c)(1).) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*In re T.V.*, at p. 133.)

---

4     There is a split of authority over how the substantial evidence standard of appellate review should be applied to a juvenile dependency finding that must be made by clear and convincing evidence. In *In re Mark L.* (2001) 94 Cal.App.4th 573 the court held, " '[O]n appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong." [Citation.]' [Citation.]" (*Id.* at pp. 580-581, fn. omitted.) In *In re Kristin H.* (1996) 46 Cal.App.4th 1635, however, the court held, "On review, we employ the substantial evidence test, however *bearing in mind the heightened burden of proof.* [Citations.]" (*Id.* at p. 1654, italics added.) We need not weigh in on this split because even assuming the latter, more demanding standard of review applies, we conclude there was sufficient evidence to support the court's order.

B.    *Analysis*

   1.    *Substantial Evidence Supports the Court's Removal of the Children*

R.C.'s substantial evidence challenge is based on her assertion that when she allowed M.R. to return home in 2013 she was unaware of M.R.'s history of sexual abuse of Abigail. We are unpersuaded.

Substantial evidence of R.C.'s knowledge of the sexual abuse exists in the form of the July 2010 interview and October 2010 statement R.C. gave to sheriff's detectives.  Those admissions by R.C.—both in her native language—establish that she knew no later than October 2010 that "[M.R.] raped [Abigail] more than once beginning when she was seven years old" and that R.C. learned of it from Abigail.[5]  Although R.C. argues there were translation issues with the statements she gave to social workers—for example, that the Spanish word she used, "molestando," simply means to "molest, bother, or annoy"—she does not direct similar attacks at her communications with the detectives.[6]

R.C. suggests that if she "had really understood that [M.R.] had repeatedly raped her oldest daughter, she would have said so" in her declaration in support of the restraining order. (Italics omitted.)  But R.C. signed that declaration on June 3, 2010—she did not learn of the

---

[5]    Because substantial evidence establishes R.C. learned of the sexual abuse from Abigail, we do not address R.C.'s arguments regarding the extent of Alexis's knowledge of the abuse or of his disclosure of it to R.C.

[6]    R.C.'s only challenge to the police report is that "[a]lthough the 2010 police report said Abigail told the police about the sexual abuse, nothing in the record indicates R.C. ever obtained a copy of that report—and even if she did, it was written in English, and she spoke only Spanish."  In other words, R.C. only argues that she could not have learned of the sexual abuse in the first instance from the police report.  This argument ignores the fact that the police report contains *R.C.'s own statements* regarding the abuse, which she gave in Spanish.

sexual abuse until Abigail told her during a physical examination that occurred no earlier than June 10.

We conclude substantial evidence establishes R.C. had sufficient knowledge of M.R.'s sexual abuse of Abigail—not to mention M.R.'s untreated domestic violence against R.C., Abigail, and Alexis, which R.C. does not dispute—when R.C. allowed M.R. to return home before the restraining order expired.

2.      *The Court Did Not Fail to Consider Less Drastic Alternatives to Removal*

R.C. further contends the court erred by failing to consider less drastic alternatives to removal.  She asserts "removal was not necessary to protect the children because: 1) there is no evidence [M.R.] committed abuse within the past three years; and 2) [M.R.] was no longer living in the home and restrained from ever returning."  Again, we are unpersuaded.

The trial court heard conflicting testimony from the social worker and Abigail regarding whether Abigail suffered further sexual abuse following M.R.'s return in 2013.  The trial court could have chosen to credit the social worker's testimony over Abigail's, reasoning, for example, that Abigail was motivated to conceal further abuse because she wanted to end an unsatisfactory foster placement and return to her mother's home.  "We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence," (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133) and will not reverse on that basis.

R.C. correctly observes that a relevant factor in ordering removal of children "in cases where the physical or sexual abuse has not been inflicted by the parent seeking to retain physical custody" is "whether the nonoffending parent allowed or might allow the offending parent to return and continue the abuse."  (*In re Steve W.* (1990) 217 Cal.App.3d 10, 21, 22.)

11

Here, substantial evidence establishes that R.C. already allowed M.R. to return to the family home even after she knew he had sexually abused Abigail repeatedly. Making matters worse, that reintroduction occurred while the restraining order was still in effect.[7]

The trial court could also have reasonably inferred that R.C. would expose her children to M.R. again. (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133 ["A parent's past conduct is a good predictor of future behavior."].) The Agency's social worker testified that R.C.'s financial dependence on M.R.—which, in part led to R.C. allowing M.R. to move home in 2013— remained unabated. And although R.C. now insists she wants nothing to do with M.R., she said essentially the same thing in 2010 when she sought a restraining order against him due to his physical abuse of her, Abigail, and Alexis. While R.C. argues it will be different this time now that she has "realized how severe the abuse was," we have already concluded that R.C. had sufficient knowledge of Abigail's sexual abuse no later than October 2010 (when R.C. gave a statement to sheriff's detectives).

Although the record indicates R.C. has begun counseling services, as of the disposition hearing she had attended only a few sessions. This led the social worker to testify that R.C. had not yet "reached the level of insight where she can protect the children." On this point, the trial court specifically observed, "So while I do believe that mother is making progress . . . , the professionals are indicating that the mother needs a little bit more time to really get a good perspective on what's occurring. The mother needs assistance in understanding the true complexity."

---

7    R.C. asserts she "allowed [M.R.] into the home only two months before the restraining order expired . . . ." This claim overlooks that R.C. began exposing the children to M.R. in early 2012, only about half way through the restraining order's three-year period.

Finally, we disagree with R.C.'s contention that "removal was not in the children's best interests." While the children may *want* to return to their mother, substantial safety concerns are paramount. We also recognize the trial court's efforts to mitigate the impact of removal by allowing unsupervised daytime visits by R.C., overnight visitations under appropriate circumstances, and "as frequent visitation between the siblings as possible."

DISPOSITION

The order is affirmed.

IRION, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.

13